# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD HOLMES | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-2171 |
| | § | |
| BAKER HUGHES, | § | |
| *Defendant.* | § | |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS OR IN THE ALTERNATIVE TO STAY PROCEEDINGS PENDING ARBITRATION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Richard Holmes ("Holmes" or "Plaintiff") comes before this Court to file his *Response to Defendant's Motion to Compel Arbitration and Dismiss or in the Alternative to Stay Proceedings Pending Arbitration* against Defendant Baker Hughes.

## I.   FACTS

1.  Plaintiff Richard Holmes (hereafter "Plaintiff" or "Holmes") has worked for Defendant Baker Hughes (hereafter "Defendant" or "Baker Hughes") since 2004.

2.  In 2017, Baker Hughes implemented a comprehensive Alternative Dispute Resolution Program ("ADRP") known to employees as "Solutions" which is memorialized in written documents and provides that Baker Hughes employees avail themselves of a mandatory system for settling workplace conflicts and purports to be the exclusive means for an employee to resolve disputes with Baker Hughes.

3.  On August 16, 2017, Baker Hughes implemented the Solutions protocol for dispute resolution and both parties agree that Mr. Holmes was emailed about the Solutions protocol on October 12, 2017, October 26, 2017, November 2, 2017, and November 21, 2017. Defendant's Exhibit A-2.

4. The November 21, 2017, email acknowledges that Holmes did not sign the agreement. Defendant's Exhibit A-2.

5. It further purports to notify Holmes that as of November 5, 2017, the Solutions protocol applies to him by virtue of his continued employment with Defendant.

6. None of the one-way correspondence to Holmes specifies or implies any consideration offered to employees as inducement to sign the Solutions document and thus far, Defendant has not articulated any consideration offered or provided to Plaintiff or any other employee as an inducement to accept the Solutions protocol.

7. In January of 2021, Mr. Holmes contracted COVID-19 and fully recovered.

8. On August 17, 2021, Baker Hughes communicated to Mr. Holmes that he would be obliged to obtain an experimental COVID-19 vaccination to ensure alignment with government regulations, under Baker Hughes North America Offshore COVID-19 vaccine requirement.

9. On October 13, 2021, Baker Hughes informed Holmes that if he obtained one vaccine dose by October 15, 2021, he would have additional time to get a final dose by November 12, 2021.

10. On October 15, 2021, Holmes requested an accommodation based on both religious and medical reasons.

11. Mr. Holmes sought a religious exemption based on his sincerely held beliefs.

12. On October 15, 2021, Baker Hughes denied Mr. Holmes request for a religious accommodation on the grounds that "exemption for an employee in the position of Field Supervisor I – DRS would create more than a minimal burden on the Company."

13. On November 15, 2021, Mr. Holmes was suspended by Baker Hughes for noncompliance with the vaccine mandate. He resubmitted the request for accommodation on November 18, 2021. On December 6, 2021, Baker Hughes denied Mr. Holmes request for a medical exemption.

14. Two days later, on December 8, 2021, Baker Hughes terminated Mr. Holmes via letter for refusal to comply with its vaccine mandate.

15. Shortly after terminating Holmes, Baker Hughes began operated its offshore rigs without a vaccine requirement.

16. Mr. Holmes filed a complaint with the EEOC and received a Right To Sue letter.

## II. ARGUMENT

### A. Though arbitration is favored in case law, arbitration agreements must involve interstate commerce and must be valid under general principles of contract law.

17. Both parties agree that the Federal Arbitration Act requires that arbitration agreements must be (1) written; (2) part of a contract or transaction involving interstate commerce; and (3) valid under general principles of contract law. 9 U.S.C. § 2.

   *i. Although arbitration agreements do not require signature, they must be agreed.*

18. Both parties agree that under Federal and Texas law "arbitration is also a creature of contract." *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 537 (5th Cir. 2003); *Ysleta Indep. Sch. Dist. v. Godinez*, 998 S.W.2d 700, 702 (Tex.App.-El Paso 1999, no pet.). Therefore, a party cannot be compelled to arbitrate a dispute unless he has agreed to do so. *Lang*, 321 F.3d at 537. A party seeking to compel arbitration must first establish that an arbitration agreement exists. *Id.* at 537; *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999*); In re Anaheim Angels Baseball Club, Inc.*, 993 S.W.2d 875, 877 (Tex.App.-El Paso 1999, orig. proceeding).

19. Under standard contract principles, the presence or absence of signatures on a written contract is relevant to determining whether the contract is binding on the parties… if the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed. *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App. 2004) (internal citations omitted).

20.     But a party's signature on a written contract is "strong evidence" that the party unconditionally assented to its terms. *Id.* In the absence of a signature, other evidence must be relied upon to prove the party's unconditional assent. *Id.* Furthermore, the parties may provide that the signature of each party is a prerequisite to a binding written contract. *Id.*

21.     In *Bunzl,* the Court specifically noted that "the Agreement is dated December 6, 1993, and Avila alleges that his employment began in June of that year. The Agreement does not provide that Avila's employment is contingent upon the Agreement, nor does it provide that employment constitutes acceptance of the Agreement. Thus, Bunzl did not necessarily manifest assent to the Agreement by employing Avila. *Id*. at 211 n.4.

22.     The court also concluded that "[a]lthough the Agreement has a signature block intended for Bunzl's representative, it was never signed" and "[f]rom this conflicting evidence, the trial court could have reasonably concluded that Bunzl did not establish the existence of an agreement to arbitrate." *Id* at 212.

23.     At Motion Page 4, Defendant asserts that the FAA requires only that arbitration agreements be in writing, not that the writing be signed by the parties to be bound. 9 U.S.C. § 2; *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987) (holding that "a party may be bound by an agreement to arbitrate even in the absence of his signature").

24.     In *Valero Refining,* the court held Valero to the arbitration agreement because 1) it acknowledged the validity of the agreement, 2) it stated that it entered into the agreement with Lauberhorn, 3) referred to the arbitration clause, and 4) explicitly stated that it reserved its right to arbitrate disputes. In its first amended complaint, Valero stated that it had executed the agreement and its counsel stated in an evidentiary hearing that no problem existed regarding the authenticity of the agreement. *Id.*

25.     Based on those six marks of agreement corroborating Lauberhorn's contention that the parties had agreed to arbitration, the Fifth Circuit concluded that "there is sufficient evidence in the record to demonstrate that the parties agreed to the … arbitration clause." *Id.*

26.     Needless to say, none of those six marks of corroboration of the agreement between Holmes and Baker Hughes are present here and this case provides no support to Defendant's request to arbitrate, indeed it is a case study in the high degree of corroboration required by the Fifth Circuit to find agreement in the absence of a signed writing.

27.     Similarly, on page 4 of the Motion, Defendant argues that the Texas Arbitration Act holds the same. *See Wright v. Hernandez*, 469 S.W.3d 744, 757 (Tex. App. 2015) (concluding that "the Texas Arbitration Act itself does not require a party's signature on an arbitration agreement in order to be enforceable, and instead only requires that the agreement be in writing").

28.     In *Wright* the court accepted Wright's collateral evidence showing the existence of an agreement on the grounds that

> Wright presented two affidavits that expressly referenced the parties' nine-page arbitration agreement, verified that the agreement was an exact duplicate of the original agreement, and verified that the agreement had been kept by Wayne Wright in the regular course of its business. Further…there is nothing in the record to suggest that the agreement submitted by Wayne Wright was not the original agreement signed by Hernandez.

*Id.* at 752.

29.     Unlike in *Wright*, Plaintiff does not raise a mere procedural defect, i.e., lack of signature, as the basis for disqualifying the validity of the Solutions document, instead unlike in *Wright*, he alleges that no agreement or meeting of the minds between the parties was ever reached rendering *Wright* inapplicable under the facts at bar.

30.     On page 4 and 5 of its Motion Defendant lists the following cases to buttress its contention that signature is not required for an arbitration agreement including:

*In re Bunzl USA, Inc.*, 155 S.W.3d 202, 210 (Tex. App. 2004) (holding that "Texas law is also in accord with decisions applying the FAA. Although the FAA requires an arbitration agreement to be written, it does not expressly require the agreement to be signed by the parties.");

*In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (holding that "neither the FAA nor Texas law requires that arbitration clauses be signed, so long as they are written and agreed to by the parties").

31. As noted supra, *Bunzl* in a factual scenario similar to the facts at bar concluded that the absence of a signature and conflicting evidence concerning the existence of agreement between the parties to be bound by the agreement constituted sufficient grounds to deny enforcement of arbitration, so it offers no support to Defendant's contention.

32. Likewise *Advance PCS Health* is distinguished from the facts in this case on the grounds that it deals with a situation where an arbitration clause was part of an underlying contract where the rest of the parties' agreement provided the consideration for the arbitration provision, however, the court noted "[i]n the context of stand-alone arbitration agreements, binding promises are required on both sides as they are the only consideration rendered to create a contract. *In re Advancepcs Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005).

33. Additionally, unlike in the facts at bar, the court noted that "Nor did anyone else testify that the Provider Agreement came only after they had joined, including several other employees and agents who often signed for de la Rosa's pharmacies. As neither affidavits nor testimony show that any pharmacy joined the PCS network without an opportunity to read the Provider Agreement, the pharmacies have not carried their evidentiary burden. *Id.* at 608, (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992)).

34.     Clearly, *Valero, Bunzl,* and *AdvancePCS* cannot stand for Defendant's proposition that the absence of a signature also obviates the need for evidence of agreement to the arbitration contract and no such agreement was present between Defendant and Plaintiff.

   ii.     *The Employment Relationship between the Parties did not implicate Interstate Commerce.*

35.     Both parties agree that the FAA only applies where participating in interstate commerce is a condition of employment. 9 U.S.C. § 2; *See also Allied/Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 274-75 (1995); *In re Big 8 Food Stores, Ltd.*, 166 S.W.3d 869, 879 (Tex. App. 2005).

36.     Defendant contends on Motion page 5 that that Baker Hughes regularly and substantially affects interstate commerce relying on *In re Big 8 Food Stores*, 166 S.W.3d at 879; and *In re ReadyOne Indus., Inc.*, 294 S.W.3d 764, 769 (Tex. App. 2009) for the proposition that "[t]he FAA applies to all suits in state or federal court when the dispute concerns a "contract evidencing a transaction involving commerce."

37.     However, Defendant's analysis completely ignores the fact that Baker Hughes is a Texas corporation located in Houston and Holmes is also a resident of Texas who was deployed in the Gulf of Mexico prior to his termination of which he was notified in Texas. In short, all of the facts at bar show that this dispute concerns two Texan parties an no evidence militates in favor of an interstate commerce component to the employment contract or relationship between the parties.

38.     In an effort to dodge this inconvenient reality, Defendant attempts on page 6 of its Motion to muddy the waters by reference to the notion that "[t]he United States Supreme Court and Texas courts hold that an express agreement to be governed by the FAA, like that set forth in Baker Hughes' ADRP, is controlling. *Forged Components, Inc. v. Guzman*, 409 S.W.3d 91, 97 n.1 (Tex. App. 2013); *In re ReadyOne Indus., Inc.,* 294 S.W.3d at 769 ('[I]f the parties expressly choose for their arbitration agreement to be governed by the FAA, the agreement should be enforced regardless of the parties' nexus to interstate commerce')."

39. Obviously, the existence of agreement, i.e., meeting of the minds, is precisely what is at issue, thus an appeal to the text of the agreement in question, stating that it implicates interstate commerce and the Federal Arbitration Act, constitutes an elementary logical fallacy. Thus, the holdings in *Guzman* and *ReadyOne* fail to offer any germane guidance.

40. On Motion at page 6, Defendant heavily relies on *Circuit City Stores, Inc. v. Adams*, for the propositions that Plaintiff's "agreement to arbitrate easily falls within Congress's broad power over commerce and "an express agreement to be governed by the FAA is controlling" 532 U.S. 105 (2001). Again, this line of analysis assumes the agreement at issue, thereby begging the question. Furthermore, *Adams* overruled a 9th Circuit ruling that held that the FAA did not apply to employment contracts. Obviously, both parties agree on that point of law and it is not at issue here. Instead, the questions are whether the alleged arbitration agreement a) actually was agreed by the parties, and b) whether the agreement falls under interstate commerce, intrastate commerce, or foreign commerce. The FAA's applicability is restricted to interstate commerce. Though the focus above described why intrastate commerce may be the most appropriate rational for examining the alleged agreement, foreign commerce is also plausible in the alternative.

41. The Federal Arbitration Act specifically exempts seamen from binding arbitration, "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S. Code § 1.

42. Unfortunately, the FAA does not define "seaman" and it has a history as a highly contested term particularly in the context of compensation under the Jones Act and the Longshore and Harbor Workers' Compensation Act (LHWCA). The Fifth Circuit has distilled a test for "seaman" along the following lines:

> …[T]he Court made clear that seamen and non-seamen maritime workers may face similar risks and perils, and that this is not an adequate test for distinguishing between the two. We therefore conclude that the following additional inquiries should be made:
> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?
> (2) Is the work sea-based or involve seagoing activity?
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Sanchez v. Smart Fabricators of Tex., L.L.C.*, 997 F.3d 564, 574 (5th Cir. 2021).

43. Unfortunately, "vessel" has also not been defined by the FAA, Jones Act, or LHWCA. However, the Revised Statutes of 1873 specified:

"In determining the meaning of the revised statutes, or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one, … [t]he word 'vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[Footnote 3] 18 Stat., pt. 1, p. 1.

44. Section 3's definition, repealed and recodified in 1947 as part of the Rules of Construction Act, 1 U. S. C. §3, has remained virtually unchanged from 1873 to the present.[Footnote 4] Even now, §3 continues to supply the default definition of "vessel" throughout the U. S. Code, "unless the context indicates otherwise." 1 U. S. C. §1.

45. The Supreme Court of the United States has noted while holding that a drudge fell within the ambit of a vessel,

> Section 3 requires only that a watercraft be "used, or capable of being used, as a means of transportation on water" to qualify as a vessel. It does not require that a watercraft be used *primarily* for that purpose. As the Court of Appeals recognized, the *Super Scoop*'s "function was to move through Boston Harbor, . . . digging the ocean bottom as it moved." In other words, the *Super Scoop* was not only "capable of being used" to transport equipment and workers over water--it *was* used to transport those things. Indeed, it could not have dug the Ted Williams Tunnel had it been unable to traverse the Boston Harbor, carrying with it workers like Stewart.

*Stewart v. Dutra Constr. Co.*, 125 S. Ct. 1118, 1128 (2005) (internal citations omitted).

46. Similarly, the oil rig on which Mr. Holmes worked, like the drudge in *Stewart* is used and capable of being used as a means of transportation on water, even though that is not its primary purpose, such that it qualifies as a vessel and meeting the first *Sanchez* element because while on the rig he was the Directional Driller Supervisor and owed his allegiance to the rig and its personnel rather than Baker Hughes corporate office while at sea.

47. *Sanchez* element two is also satisfied since work on an offshore drilling rig is indubitably sea based.

48. Finally, *Sanchez* element three is also satisfied, as Plaintiff was at sea, and living on his rig for many months, and not merely 13 days, as Sanchez did and the Fifth Circuit found insufficient in *Sanchez,* 997 F.3d 564, at 567.

  iii.    *Solutions is not binding under Texas law*.

49. Both parties agree that the validity of an arbitration agreement is determined by reference to general principles of contract law. *Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996); *see also Perry v. Thomas*, 482 U.S. 483, 492, n. 9 (1987); Motion at 6.

50. As the general principles of law do not include the idea that a multi-national organization can add to the duties of an employee without new consideration, this Court is not obligated to take the Defendant's militant pro-forced arbitration position.

51. Defendant's reliance on *In Re Haliburton*, 80 S.W.3d 566 (Tex. 2002) also fails. Defendant argues that this case teaches that a company can send out emails and change the terms of the working environment and add to the duties of an employee without paying additional consideration, and without regard as to the nature of the claim that an employee might have. But even then, the present case differs from *Haliburton*:

  a. The Texas Supreme Court's opinion in *Haliburton* assumed that the relationship constituted "interstate commerce", which Plaintiff does not accept here, because both

    parties are in Texas and the work was performed off of the coast of Texas. In an arbitration case, there is no reason for a federal court to use the minimalist and inexcusable *Wickard v. Filburn* level of imagined commerce to find interstate commerce where none exists, because that low bar would *always* be met when money is changing hands, and no arbitration case would fail the test. *Wickard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82 (1942).

b. The present case does not include the protections and safeguards present in *Haliburton*, as Haliburton provided $2500 to pay for an attorney. 80 S.W.3d at 572. Defendant in the present case does not provide that assistance, forcing a litigant to navigate complex arbitration processes without assistance, factually separating this case from *Haliburton*.

c. In *Haliburton*, the Texas Supreme Court claimed that general contract principles applied. In Texas, generally speaking, an employer cannot simply proclaim new working terms and then force those new terms on hapless employees working on an oil rig in the Gulf of Mexico, and win a contract dispute by asserting, "Well, you could have left, instead of working." While that option might be factually true, an employee working on an oil rig clearly has had to plan for being gone for a protracted time from his home, making arrangements for his absence, etc. To tell an employee who has made such arrangements that he can leave if he does not like the new rules when he is midway through a several-month task is severely inequitable. Additionally, the assumption of acceptance due to continued employment should be reconsidered generally; to suggest that merely continued employment is sufficient to change the contract is a one-sided view that improperly favors the company over the employee and cannot be considered "general contract principles". According to such a policy, if an employee sent an email back to the employer in which the employee stated explicitly that he was rejecting the new arbitration policy and was

    going to continue working, would that change the presumption in a classic "battle of the forms" scenario? Plaintiff asserts that the better social policy is to actually employ general contract principles instead of just pretending to do so. Courts should require a meeting of minds to change to this contract, just like it does in every other context.[1]

d. Also in *Haliburton*, no one disputed that the plaintiff was aware and had notice of the company's forced arbitration process. There exists no evidence before this Court that Plaintiff had notice of Defendant's adopted policy forcing arbitration. As stated in the Complaint, Plaintiff resided and worked on an oil rig off the coast. Defendant has no evidence that Plaintiff ever read or was aware of the arbitration rules. Even in the Defendant's *Motion to Compel Arbitration*, the closest it gets to any kind of evidence is in the Declaration of Pratt, where the declaration states that Plaintiff was sent an email on the "rollout of Solutions" and then sent three additional reminder emails. At no point does Defendant present any evidence that Plaintiff ever received or read these emails.

e. Additionally, the asserted Arbitration Agreement specifies that it covers specific claims, such as compensation and promotion, but does not cover other specific claims, such as

---

[1] Arbitration agreements are interpreted under traditional contract principles. *Jenkens & Gilchrist v. Riggs,* 87 S.W.3d 198, 201 (Tex. App.-Dallas 2002, no pet.); *Pepe Int'l Dev. Co. v. Pub Brewing Co.,* 915 S.W.2d 925, 930 (Tex. App.-Houston [1st Dist.] 1996, no writ); *see also First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995) (holding that, when deciding whether the parties agreed to arbitrate, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts"). Thus, an employer attempting to enforce an arbitration agreement must show the agreement meets all requisite contract elements. At-will employment does not preclude formation of other contracts between employer and employee, so long as neither party relies on continued employment as consideration for the contract. *See Light v. Centel Cellular Co.,* 883 S.W.2d 642, 645, 37 Tex. Sup. Ct. J. 838 (Tex. 1994) (because at-will employer always retains the option to discontinue employment at any time, the promise of continued employment is illusory and insufficient consideration for employee's promise not to compete). Here, the parties dispute whether the reciprocal promises to arbitrate are sufficient consideration to support enforcing the arbitration agreement.

intellectual property claims. Plaintiff's claims are more than mere here is making constitutional-like claims here under an executive order which stated that it "suspend[ed] all relevant statutes to the extent necessary to enforce the prohibition" to compel vaccination as a condition of employment. This issue, by itself, separates this case from mundane contract claims, adding another level of defense against a forced arbitration. To take Defendant's view, it can force employees to participate in forced arbitration on claims based on rights created by the governor during an executive order and deny a jury on the question, without providing new consideration or discussing the matter, all even without showing that the employee had actual knowledge of the forced new process. This mix of inequity was not present in *Haliburton*, and thus should not be a guide to this Court in this case. And if *Haliburton* stands for the contention that "general contract principles" allows such one-sided lack of meeting of minds to amend contracts in Texas, then *Haliburton* is wrong and it is time for caselaw to change.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray this Court deny Plaintiff's Motion to arbitrate this case and grant other relief as the Court may deem just.

Respectfully submitted,

*/s/Warren V. Norred*
Warren Norred, TX Bar 24045094, Norred Law, PLLC
515 E. Border, Arlington, TX 76010
817-704-3984 O; 817-524-6686 F
wnorred@norredlaw.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE** - I certify that the above was served via eservice on counsel for Defendant Baker Hughes, Mary Jo L. Roberts sz@kullmanlaw.com on August 16, 2023.

*/s/Warren V. Norred*
Warren V. Norred